UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

City of South Burlington,          :
        Plaintiff,                 :
                                   :
        v.                         :   Civil No. 1:05-CV-230
                                   :
Towle-Whitney Associates, Inc.     :
        Defendant/Third Party      :
        Plaintiff                  :
                                   :
        v.                         :
                                   :
Master Meter, Inc.,                :
        Third Party Defendant.     :


## MAGISTRATE JUDGE'S REPORT & RECOMMENDATION
(Papers 45, 49, 55)

Plaintiff City of South Burlington ("City") brought this action against Defendant/Third Party Plaintiff Towle-Whitney Associates, Inc., ("Towle-Whitney") for breach of contract and breach of warranty.  Towle-Whitney brought a derivative liability action pursuant to Fed. R. Civ. P. 14 against Third Party Defendant Master Meter, Inc. ("Master Meter") for indemnification, breach of contract and breach of warranty.   The case is currently before the Court on Towle-Whitney's motion for summary judgment against the City (Doc. 45), the City's cross motion for summary judgment against Towle-Whitney (Doc. 49), and Master Meter's motion

for summary judgment against Towle-Whitney (Doc. 55).

For the following reasons, I recommend that all motions be denied.

## I. FACTUAL BACKGROUND

The following facts are undisputed unless otherwise noted.

## A. City and Towle-Whitney Relationship

The City operates a municipal water system, which provides water for residential, commercial, and other City uses. (Paper 50, at 1).  In order to bill individual water customers for their water usage, the City provides each account with a meter to measure the amount of water used. (Id.).  There are approximately 5,600 metered accounts. (Id.).  In early 2002, the City sought bids for a drive-by water meter reading system.  (Id. at 2).  To limit the bids received, the City included particular requirements in its Request for Proposal (RFP).  (Id.; Paper 51, ¶ 1, Exhibit A[1]).  The RFP sought a radio frequency (RF) based Automatic Meter Reading (AMR) System.  The RFP also indicated that warranty coverage and vendor qualifications would be

---

[1] Exhibits attached to Towle-Whitney's motion for summary judgment are referenced by letters (e.g. Exhibit A); exhibits attached to the City's cross-motion for summary judgment are referenced with numbers (e.g. Exhibit 1).

evaluated with bid submittals. (Paper 51, ¶ 2).

On April 8, 2002, Towle-Whitney, a merchant of water system equipment, submitted a proposed bid with four options for complete RF based AMR systems. (Ex. B). The City accepted the proposal on July 15, 2002, choosing the Drive-by Radio Read System (option #4) (hereinafter the "System"). (Ex. C).  The System had three components: (1) a radio transmitter; (2) a programmer; and (3) a reading system (receiver, laptop computer, and route management software). The purpose and benefit of the System is to read meters, record the information and prepare account bills in one integrated system.  The transmitters or meter-reading units (MIU) are attached to each water meter.  (Ex. B).  The transmitter reads and transmits water usage information via radio frequency to the receiver.  (Id.).  The System's receiver is connected to a vehicle-mounted laptop computer equipped with route management software, which stores and prepares the information for downloading to the billing system.  (Id.).

The agreed price of the System, without the transmitters, was $17,583.00.  (Ex. C).  The transmitters cost $49.95 each.  (Id.).  The City initially ordered 5,050

3

transmitters with the option to order more,[2] specifying that 400 of the 5,050 were to be a particular model number (06-20) in order to read different types of water meters.  (Id.) The transmitters and receivers were AT RAMAR LLC ("RAMAR") products; while the laptop and software were from other companies. (Ex. B, at 8).  Specifically, the transmitters described in Towle-Whitney's bid and again in the July 15, 2002 agreement were RAMAR TransPondITs.[3] (Exs. B and C). The receivers were RAMAR FastTrackITs and the programmer was a RAMAR ConFigIT. (Exs. B and C).

The contract between the City and Towle-Whitney also included warranty and service provisions.  The parties dispute whether the warranty on the transmitters was a pass-through warranty from RAMAR or a warranty from Towle-Whitney itself.  The contract did not include installation, but rather, Towle-Whitney and RAMAR trained City employees to install the system. (Ex. C).  The contract provided for

---

[2] The parties dispute whether the City ordered all 5,050 transmitters in the original July 15, 2002 agreement or whether it placed individual purchase orders.  Towle-Whitney characterizes the invoices in Exhibit F as "original purchase orders," while the City relies on deposition testimony of Jay Nadeau (City superintendent) that the City never had a purchase order system, but rather that Towle-Whitney "took it upon themselves . . . to begin shipping [the City] units," (Exhibit 3, at 21-21), and that the invoices only show the units shipped to and paid for by the City. (Paper 51, at 7).

[3] The parties dispute whether the TransPondIT is a transmitter model with different versions or whether the agreement failed to specify a transmitter model, but gave the general TransPondIT product information.  (Paper 51, at 5).

software training from Greentree Applied Systems Tech Support ("Greentree"). (Id.). Towle-Whitney also made itself, Greentree, and Master Meter available to the City for service on the System, though the City never purchased a service contract. (Ex. B, at 8; Paper 51, at 5).

The 5,050 transmitters were to be shipped to the City in periodic installments because the City's personnel could not install the entire system at once. (Paper 52, ¶ 16). Problems arose, however, when the transmitters arrived apparently defective or failed after being installed. (Id. at ¶ 11). Between September 2002 and April 2003 Towle-Whitney shipped 4,592 transmitters to the City. (Ex. F). The City returned its first shipment of allegedly defective transmitters on November 16, 2002. (Doc. 50, at 3; Doc. 52, ¶ 11). In all, the City returned 4,045 transmitters it believed were defective and never received the full 5,050 new transmitters originally ordered. (Doc. 52, ¶ 11). The City has approximately 4,281 transmitters installed, though only 3,735 continue to function and 546 of them have failed. (Id. at ¶ 4; Ex. M). The last shipment of transmitters was

in August 2004.[4] (Id. at ¶ 4).

Neither Towle-Whitney nor RAMAR refused acceptance of the returned units. (Id. at ¶¶ 12, 14; Ex. 1, at 206). Nevertheless, the failure to deliver replacement and originally ordered transmitters to the City prompted a number of meetings.  Representatives of the City, Towle-Whitney and RAMAR were present at two meetings and a conference call regarding the transmitters and shipment issues. (Id. at ¶ 14; Exs. I, J).  The first meeting occurred on February 13, 2004.  A RAMAR representative wrote a follow-up letter on April 12, 2004 to the City, with copies to Towle-Whitney, memorializing that there were defective transmitters, that the City had recently sent 1,350 units back to RAMAR, and that RAMAR provided 419 replacement units and would continue to provide the remainder on a monthly basis.  (Ex. G).  The letter also included a replacement agreement, compensating the City for labor by providing 4.5 replacement transmitters for every 3 failed units returned. (Id.).  On April 13, 2004, Jay Nadeau, Superintendent for the City, signed the April 12

---

[4] The parties dispute whether the shipments ended because the City stopped ordering transmitters or because Towle-Whitney stopped shipping those already ordered. (Paper 51, at 7; Paper 52, ¶ 4).

letter, acknowledging his agreement with the proposed replacement plan. (Id.). Another meeting, on December 15, 2004, was scheduled to further address the transmitters' defects and RAMAR's failure to deliver enough transmitters. (Ex. I). At that meeting, the City set June 1, 2005 as a final deadline for receipt and installation of RAMAR transmitters to replace the alleged defective ones. At the time 1,200 units of the original 5,050 ordered had not been delivered. (Ex. J).

On February 1, 2005, Nadeau wrote to RAMAR expressing concern that the City had not received any information about the remaining units due or any schedule for replacement units. (Ex. Q). Shortly thereafter, on March 8, 2005, counsel for the City wrote to Towle-Whitney seeking a shipment and installation schedule within 15 days in order to ensure that the System would be operational by the June 1 deadline. (Ex. K). Towle-Whitney did not respond to the March 8 letter or send the City a shipment or installation schedule. (Ex. M). The City's lawyer sent another letter on May 18, 2005 that purported to revoke the City's acceptance of the System and demanded money damages. (Id.). This suit followed.

B. <u>Towle-Whitney and Master Meter Relationship</u>

Master Meter is an authorized reseller/distributer for RAMAR products. (Paper 62, ¶ 1; paper 68, ¶ 3). It had an Original Equipment Manufacturer (OEM) Agreement with RAMAR, which began on February 24, 2000 for a 12 month term and automatic 12-month renewal terms unless either party gave proper notice of termination. (Paper 64, n. 13). Master Meter and Towle-Whitney have had a business relationship since before 1999 whereby Towle-Whitney sold and/or "repped" water meters for Master Meter. (Paper 68, ¶¶ 1-2). Sometime after Master Meter entered into its OEM agreement with RAMAR, it sought to grow its water meter business in the Northeast with, *inter alia*, sales of RAMAR products. (Paper 68, ¶ 3).

In mid to late 2001, Master Meter's marketing director Charles Rehburg approached Towle-Whitney about carrying RAMAR's products and RAMAR sales representative Michael Koutelis met with Towle-Whitney sales representative James ("Jay") Gwinn to discuss how RAMAR TrandPondIT units could be introduced to municipalities. (<u>Id</u>). Koutelis and Gwinn worked together in deciding with which municipalities RAMAR and Towle-Whitney would jointly contract. (Id.).

Apparently, Koutelis knew about the City's water meter needs because he informed Gwinn and Towle-Whitney that the City would be releasing a RFP and if Towle-Whitney wanted to be involved in it, they should make some advance sales calls to be ready to bid. (Paper 68, ¶ 3; Id. at n. 22).  Before making its bid, Towle-Whitney intended to pitch the TransPondIT unit to the City. (Id. at ¶ 6 n. 35 (Gwinn deposition, at 210:4-21)).

Towle-Whitney worked with Master Meter to prepare its bid to the City.  (Paper 68, ¶ 3 n. 23).  Towle-Whitney relied heavily on Koutelis and Master Meter to supply technical information for the proposal which Master Meter prepared into a package and forwarded to Towle-Whitney to sign and submit to the City. (Id. at ¶ 3 n. 24).  Towle-Whitney inputted price and margin information, but sent the bid proposal to Neil Farmer, Master Meter's National Sales Manager, to ensure it met all exceptions and specifications. (Id. at ¶ 3 n. 25).

Upon the City's acceptance of Towle-Whitney's bid proposal, Towle-Whitney ordered the RAMAR product from Master Meter. (Paper 62, ¶ 2).  The RAMAR product was shipped directly to Towle-Whitney or the City from RAMAR –

not from Master Meter - and installed by City employees. (Id.).  None of the allegedly defective transmitters were sent to Master Meter, but rather, they were sent back to RAMAR. (Paper 56, ¶ 3).  There were issues, however, in January 2003 over Towle-Whitney's outstanding balance due Master Meter. (Paper 57, Ex. 4).  Towle-Whitney paid its balance on February 14, 2003 and explained that 1,362 TransPondIt units had to be replaced for technical reasons, that RAMAR had shipped 300 replacement units directly to the City, and that there was a plan for the continued installation of TransPondITs.  Id.

On June 12, 2005, Towle-Whitney notified Master Meter in writing that it was revoking its acceptance of the RAMAR product it purchased from Master Meter. (Paper 57, Ex. 6). Master Meter did not receive direct written or verbal notice of the problems in the 2 ½ years (September 2002-June 2005) Towle-Whitney was aware of them. (Paper 56, ¶ 9).  Neither the City nor Towle-Whitney requested Master Meter to evaluate the problems, assist in remedying the problems, repair allegedly defective units, and ship new units. Id. at ¶ 10).  The problems the City experienced with its System, namely the inability to obtain meter readings, could have

resulted from (1) defective transmitter units; (2) wiring/installation problems; (3) unit wires being pinched from repairs at the home; (4) City employees transposing account address numbers when entering them into the computer; or (5) the wrong color code. (Paper 57-1, Ex. 5 Nadeau depo., at 140:9-25, 141:1-13).

Master Meter did not provide a written warranty on the RAMAR units. (Paper 56, ¶ 11). The units in question were manufactured by RAMAR and RAMAR provided the warranty. (Id.). There is no written contract, agreement or partnership between Master Meter and Towle-Whitney providing for indemnification. (Id.). In addition, no Master Meter representative ever told Towle-Whitney that Master Meter would indemnify Towle-Whitney for claims asserted against it with regard to the units in question. (Id.).

C. Procedural Background

The City filed suit against Towle-Whitney on August 26, 2005 for breach of contract and warranty after receiving no response to its May 18 demand letter. Towle-Whitney filed a third-party suit against Master Meter on November 2, 2005, also for breach of contract and warranty. On August 21, 2006, Towle-Whitney moved for summary judgment against the

11

City on all claims.  The City responded with a cross-motion for summary judgment on September 21, 2006.  Finally, on November 2, 2006, Master Meter moved for summary judgment against Towle-Whitney.  All three motions are currently before the Court.

## II. <u>DISCUSSION</u>

### A. **Standard of Review**

Summary judgment should be granted only if "there is no genuine issue as to any material fact and [therefore] the moving party is entitled to a judgment as a matter of law," Fed. R. Civ. P. 56(c).  The moving party bears the initial burden of showing an absence of any genuine issue of material fact.  <u>Feingold v. New York</u>, 366 F.3d 138, 148 (2d Cir. 2004) (citing <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986)).  In ruling on a motion for summary judgment, "the court must resolve all ambiguities and draw all reasonable inferences in favor of the party against whom summary judgment is sought." <u>Winter v. United States</u>, 196 F.3d 339, 346 (2d Cir. 1999) (citing <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 255 (1986)).  Further, "[c]redibility assessments, choices between conflicting versions of the events, and the weighing of evidence are

matters for the jury, not for the court on a motion for summary judgment." Fischl v. Armitage, 128 F.3d 50, 55 (2d Cir. 1997).

The Court has subject-matter jurisdiction over this suit because the parties have diversity of citizenship pursuant to 28 U.S.C. § 1332(a). The claims in this diversity case arise under Vermont law and thus, this Court must apply that law to all substantive matters before it. Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938); DiBella v. Hopkins, 403 F.3d 102, 110 (2d Cir. 2005). In addition, because the contract at issue involves the sale of goods, Article 2 of the Uniform Commercial Code (UCC) applies. See 9A V.S.A, § § 2-201 to 2-725 (Article 1, Sales).

**B. Arguments**

### 1. City and Towle-Whitney

The City alleges in its cross-motion for summary judgment that Towle-Whitney breached its July 15 contract to sell 5,050 transmitters to the City as part of the System by failing to deliver the agreed upon number of transmitters. In addition, the City alleges Towle-Whitney breached its warranty because the transmitters arrived defective or became inoperable after installation. The City contends

that it properly revoked its acceptance of the entire System and is entitled to revocation together with incidental and consequential damages.[5]

Towle-Whitney argues that the City never ordered the 5,050 transmitters and therefore cannot maintain a claim of breach for non-delivery.  Towle-Whitney also contends that the City failed to properly revoke its acceptance and, in any event, entered into a novation with RAMAR, which required the City to notify RAMAR, not Towle-Whitney, of its revocation.  Alternatively, Towle-Whitney asserts three bases that preclude the City from revoking its acceptance: (1) the City attempted to revoke versions of the transmitters Towle-Whitney never sold; (2) the City's continued use of System is inconsistent with revocation; and (3) there is no proof RAMAR evaluated the returned transmitters and deemed them faulty as required under the contract.  Finally, Towle-Whitney contends that the City cannot maintain its breach of warranty claim because the warranty provided was a pass-through manufacturer warranty.

---

[5] The City's breach of contract claim and revocation of acceptance are not alternative remedies.  9 V.S.A. § 2-608 cmt 1 (1994).  Rather, a revocation of acceptance and the rights and duties that follow apply to specific goods whose acceptance was revoked.  Id. at § 2-608(1).  Here, there were goods allegedly not delivered, goods allegedly defective on delivery, and goods that allegedly became defective after installation.

### 2. Master Meter

In the third-party dispute, Master Meter argues that it is entitled to summary judgment on Towle-Whitney's alleged revocation of acceptance, breach of contract and breach of warranty claims because Towle-Whitney failed to notify Master Meter of breach and/or its intent to revoke acceptance in a reasonable time. It also argues that Towle-Whitney is not entitled to indemnity from Master Meter or recovery for breach of warranty. Finally, Master Meter contends that Towle-Whitney's claims must fail because neither the City nor Towle-Whitney have established that the units were indeed defective.

### C. Disputed Material Facts

There are several disputed material facts in all three motions, making summary judgment inappropriate at this stage in the litigation. The parties dispute (1) whether the transmitters were in fact defective (2) whether the City's and Towle-Whitney's notice of revocation was reasonable, and (3) whether the City, Towle-Whitney and RAMAR intended to enter into a novation. These issues are material facts for the fact-finder, not the Court, to decide.

15

1. Defectiveness of the transmitters

The first disputed fact is whether or not the transmitters were indeed defective and, therefore, the cause of the problems with the System. The City alleges that the actions of the parties show circumstantially that the transmitters were defective. Towle-Whitney contends that it was a new distributor of this product and not competent to make any determination about whether the transmitters were working properly. Finally, Master Meter contends that the City has not met its burden of proving the transmitters were defective and the cause of the System failures, a showing that requires expert testimony. The City has not designated an expert in this matter and was not willing to concede that an expert is required here. Regardless of whether an expert is required to show causation, however, the City agrees that the issue of the transmitter's defectiveness is material.

The defectiveness issue impacts the breach of contract and warranty claims. As to the City's breach of contract claim, Towle-Whitney delivered, *in toto*, more than the 5,050 transmitters the City ordered, when replacement units are taken into account. Because there is a dispute about the defectiveness of the units, the Court cannot determine if

Towle-Whitney failed to deliver 5,050 functioning units.

Similarly, an element of the City's revocation of acceptance is that the allegedly defective transmitters must substantially impair the entire System.   9A V.S.A. § 2-608. Absent proving the units were in fact defective, the City cannot meet this element and fails to show it properly revoked its acceptance.   Towle-Whitney's continued use defense to the City's revocation is therefore moot.   In addition, without a proper revocation, the Court must reach the breach of warranty claim.  Jensvold v. Town & Country Motors, Inc., 162 Vt. 580, 587 (1994) (noting breach of warranty damages are considered "acceptance damages" not applicable when acceptance is properly revoked); Capitol Cadillac Olds, Inc. v. Roberts, 813 S.W.2d 287, 290 (Ky. 1991) (noting revocation of acceptance and damages for breach of warranty mutually exclusive).  Here, however, whether the transmitters were defective is material in determining whether any warranty was breached.

Finally, if Towle-Whitney cannot be held primarily liable to the City for breach of contract or warranty without proof that the transmitters were in fact defective, neither can Master Meter be held derivatively liable

17

pursuant to Rule 14 of the Federal Rules of Civil Procedure.[6]

## 2. Reasonable Notice

The second disputed material fact is whether the City and Towle-Whitney gave reasonable notice of breach or revocation.  Reasonable notice is required for proper revocation of acceptance. 9A V.S.A. § 2-608. Similarly, after acceptance a buyer must, within a reasonable time after discovery of a breach, notify the seller or be barred from any remedy.  9A V.S.A. § 2-607(3)(a);  Wilk Paving, Inc. v. Southworth-Milton, Inc., 162 Vt. 552, 555 (1994). "[W]hat is a reasonable time . . . depends on the nature, purpose and circumstances of" the transaction. 9A V.S.A. § 1-204(2).  The timeliness of a notice for revocation or breach is a question of fact.  Agway, Inc. v. Teitscheid, 144 Vt. 76, 80 (1984).

Here, Towle-Whitney and the City dispute that the City's notice of revocation two and a half years after the installation of the System was reasonable under the circumstances.  In addition, Towle-Whitney and Master Meter

---

[6] Joinder of parties pursuant to Rule 14 requires derivative liability whereby a defending party may, as a third-party plaintiff, bring in a person not a party to the action if and only if that person  "is or may be liable to the third-party plaintiff for all or part of the plaintiff's claim against the third-party plaintiff." Fed. R. Civ. P. 14(a).

dispute that Towle-Whitney's notice of revocation, upon learning of the City's revocation of the System, and notice of its breach of contract and warranty claims was timely. The reasonableness of notice is a matter for the fact-finder, not the Court.  Because the notice issues are material to the breach of contract, warranty and revocation claims, summary judgment on those claims is inappropriate.

3. Novation

Towle-Whitney's claim that the City entered into a novation with RAMAR is not appropriate for summary judgment because there is a dispute as to whether the parties contemplated a novation.  Towle-Whitney argues that the April 12 letter from Mike Koutelis of RAMAR to City Superintendent Nadeau constituted a novation whereby RAMAR took Towle-Whitney's place in the underlying contract with the City.  In order to constitute a novation "there must be a valid existing contract which is extinguished by the mutual agreement between the original obligors and obligees and the new party." H.P.  Hood & Sons v. Heins, 124 Vt. 331, 340 (1964).  A novation is never presumed and therefore requires evidentiary support.  Whitcomb Constr. Corp. v. Cedar Constr. Co., 142 Vt. 541, 544 (1983).  Proof that a

19

meeting of the minds has occurred between all of the parties involved, as well as their consent and knowing acceptance of the transferred obligations, is required for a novation. Id.

    Here, the mutual understanding is disputed and no undisputed evidence exists to prove that the April 12, 2004 letter extinguished the contract between the City and Towle-Whitney.  The City contends that none of the parties, itself, Towle-Whitney, and RAMAR, contemplated a novation. On its face, the April 12 letter makes no mention of a novation explicitly; nor does it reference any transfer of obligations from Towle-Whitney to RAMAR.   Towle-Whitney makes much of the City's signing the April 12 letter, but a purported novation requires consent and knowing acceptance from all parties involved in the transfer, and no Towle-Whitney representative signed the agreement.  The April 12 letter is clearly an agreement to solve what the parties believed to be manufacturing issues plaguing the defective transmitters.  The fact that it is an agreement between the City and the manufacturer, however, does not mean the City or any other party intended it as a novation, extinguishing Towle-Whitney's obligations under the underlying contract.

The parties intentions are questions of fact, material to a
novation and in dispute here.  Accordingly, summary judgment
on whether there was a novation is inappropriate.

D. Remaining issues

Towle-Whitney agrees that the issue of defectiveness is
a disputed material fact, but nevertheless contends summary
judgment is appropriate because Towle-Whitney bargained to
sell only the V-2 model transmitters in its RFP and not the
subsequent model versions (V-4s and V-6s) that were
delivered to the City and because the warranty provided was
a pass-through warranty from RAMAR, not from Towle-Whitney.

The undisputed facts, especially the deposition
testimony from Towle-Whitney representatives, belies its
argument that it never contemplated selling, delivering and
servicing V-4 and V-6 version TransPondIT transmitters.  The
terms of the July 15, 2002 contract between the City and
Towle-Whitney listed RAMAR TransPondITs, but did not include
any particular version of model. (Ex. C).  Under Towle-
Whitney's theory, the model transmitter it intended to sell
was no longer on the market because RAMAR ceased production
of the V-2 units and released the V-4 units as a part of
"product life cycle," before July 15.  (Ex. D).  Such a

claim is disingenuous at best if the Court takes into account Towle-Whitney's own claim against the City for breach of contract in not ordering the balance of the 5,050 transmitters it agreed to purchase.  If the V-2s were no longer available, Towle-Whitney lacked any transmitters to sell.  In fact, deposition testimony from Towle-Whitney itself suggests that there was no distinction between transmitter models and that Towle-Whitney employees worked with South Burlington to try to correct the problems plaguing the system.  (Ex. 1, at 202:8-14, 203:1-20).  Towle-Whitney was not only aware of the frequent change in transmitter model, but admitted the changes compounded its work to resolve the City's transmitter issues. (Ex. 2, at 77: 1-7, "[The situation] was compounded because [Ramar] changed the TransPondITs . . . it got confusing."). Accordingly, the Court finds that the July 15 agreement between the City and Towle-Whitney was not limited to the sale of the V-2 or any other particular version of the RAMAR TransPondIT transmitter.

As addressed above, the breach of warranty claim is not properly before the Court because the defectiveness of the transmitters is a disputed fact, which calls into question

whether the City can assert a breach of warranty claim. Nevertheless, Towle-Whitney is asking this Court to find that the warranty in question was of a pass-through variety. Such a declaratory judgment is not properly before this Court and accordingly, Towle-Whitney's motion in that regard should be denied.

<u>Conclusion</u>

For the reasons set forth above, I recommend that the City's, Towle-Whitney's, and Master Meter's motions be denied.

Dated at Burlington, in the District of Vermont, this 13th day of July, 2007.

/s/ Jerome J. Niedermeier
Jerome J. Niedermeier
United States Magistrate Judge

Any party may object to this Report and Recommendation within 10 days after service by filing with the clerk of the court and serving on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections.  Failure to file objections within the specified time waives the right to appeal the District Court's order. See Local Rules 72.1, 72.3, 73.1; 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b), 6(a) and 6(e).